**WILMINGTON TRUST COMPANY,
Plaintiff,**

v.

**AEROVIAS de MEXICO, S.A.
de C.V., Defendant.**

**No. 94 Civ. 8543 (SAS).**

United States District Court,
S.D. New York.

March 16, 1995.

Kevin J. Burke, Cahill, Gordon & Reindel, New York City, for plaintiff Wilmington Trust Co., not in its individual capacity, but solely as Owner Trustee/Lessor.

George Weisz, Cleary, Gottlieb, Steen & Hamilton, New York City, for defendant Aerovias de Mexico, S.A., de C.V.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

### I. Introduction

Plaintiff Wilmington Trust Company ("Wilmington") sues defendant Aerovias de Mexico, S.A. de C.V. ("Aeromexico") for breach of a Lease Agreement ("Lease") entered into on December 1, 1992. Wilmington claims that Aeromexico is in default under the terms of the Lease, which is for a McDonnell Douglas MD–82 aircraft, because it failed to make a required rental payment of $685,511.63 on October 24, 1994. Wilmington further claims that Aeromexico's default accelerates its obligations under the Lease and requires it both to return the aircraft and to pay liquidated damages in the amount of over $9 million.

On January 3, 1995, Wilmington moved for summary judgment pursuant to Fed.R.Civ.P. 56 on all of its claims against Aeromexico.[1] After reviewing the parties' submissions, the Court granted Wilmington's motion at the conclusion of oral argument on February 15, 1995. The Court held that Aeromexico's failure to make a rental payment was an "event of default" as defined under § 14(a) of the Lease which entitled the Series A Certificate Holder ("Series A Holder") to direct Wilmington to accelerate Aeromexico's remaining obligations under the Lease. However, the Court declined to issue a final judgment at that time and ordered the parties to submit a proposed order and judgment specify-

ing the amounts owed by Aeromexico to Wilmington under the Lease.

Although Wilmington submitted a proposed order and judgment on March 2, 1995, the parties could not agree on several issues and submitted letter-briefs detailing their positions regarding these disputed issues. This Opinion and Order supplements the Court's oral ruling of February 15, 1995 by addressing these additional issues raised by the parties. The Court also addresses the enforceability of the liquidated damages clause contained in the Lease, an issue that was the primary focus at the February 15, 1995 oral argument. Familiarity with the underlying facts and circumstances is assumed for purposes of this Opinion.

### II. Discussion

#### A. Liquidated Damages

■ The Court's February 15, 1995 oral opinion held that the liquidated damages clause, which is contained in § 15(h) of the Lease, was not an unconscionable penalty clause under New York law. *See* Transcript of Hearing ("Tr."), February 15, 1995 at 45–46. In its proposed order, Wilmington seeks, pursuant to § 15(h), the return of the aircraft as well as a money judgment of $8,978,112.70, plus interest. Wilmington computed this amount under § 15(h) by adding i) the amount of the missed rent payment ($685,-511.63) to ii) the "Stipulated Loss Value" ($10,100,000.00), which is owed to plaintiff upon a "Lease Event of Default"—such as a missed rent payment—and a declaration by the Series A Holder that the Lease Participation Certificates are due and payable, and then subtracting iii) the proceeds already received from the Cash Collateral Account ($1,789,699.75) and iv) a payment made by Aeromexico on December 1, 1994 ($17,-689.10). With interest (calculated to February 17, 1995), the total amount due under Wilmington's proposed order is $9,227,809.08. *See* Wilmington Letter, dated March 2, 1995 ("Wilmington Let.") at 3.[2]

---

1. Wilmington originally sought and obtained an Order of Attachment on November 25, 1994. By Stipulation and Order of December 16, 1994, the parties agreed to vacate this Order.

2. As noted above, Wilmington has already received $1,789,699.75, which was withdrawn by the Series A Holder from the Cash Collateral Account, and $17,689.10 from a payment made by Aeromexico on December 1, 1994. Thus, the

Aeromexico contends that this relief computed under § 15(h) is excessive and constitutes an unenforceable penalty clause under New York law. Aeromexico argues that allowing Wilmington to recover both the remaining Lease payments as well as the aircraft itself is a double recovery which is "grossly disproportionate" to the amount of actual damages Wilmington will experience as a result of Aeromexico's breach of the Lease. *See* Defendant's Memorandum of Law ("Def.Mem.") at 21–24.

■ In order for a court to enforce a liquidated damages clause under New York law, the clause must specify a liquidated amount which is reasonable in light of the anticipated probable harm, and actual damages must be difficult to ascertain as of the time the parties entered into the contract.[3] *Truck Rent–A–Center, Inc. v. Puritan Farms 2nd, Inc.,* 41 N.Y.2d 420, 425, 393 N.Y.S.2d 365, 361 N.E.2d 1015 (1977). A clause which provides for an amount plainly disproportionate to actual damages is deemed a penalty and is not enforceable because it compels performance by the very disproportion between liquidated and actual damages. *Id.; Fifty States Management Corp. v. Pioneer Auto Parks, Inc.,* 46 N.Y.2d 573, 577, 415 N.Y.S.2d 800, 389 N.E.2d 113 (1979); *Leasing Service Corp. v. Justice,* 673 F.2d 70, 73 (2d Cir.1982). The enforceability of a liquidated damages provision can be determined by the court as a matter of law. *Leasing Service Corp.,* 673 F.2d at 74; *Bigda v. Fischbach Corp.,* 849 F.Supp. 895 (S.D.N.Y.1994).

■ When analyzing the reasonableness of a liquidated amount, a court must also give due consideration to the nature of the contract and the attendant circumstances. *See J.R. Stevenson Corp. v. County of Westchester,* 113 A.D.2d 918, 493 N.Y.S.2d 819, 823 (2d Dep't 1985); *Bigda,* 849 F.Supp. at 902. Relevant to this inquiry is the sophistication

of the parties and whether both sides were represented by able counsel who negotiated the contract at arms length without the ability to overreach the other side. *Bigda,* 849 F.Supp. at 902–903; *Boyle v. Petrie Stores Corp.,* 518 N.Y.S.2d 854, 861 (Sup.Ct.N.Y.Co. 1985). Moreover, a court should not interfere with the agreement of the parties, absent some persuasive justification. *Fifty States Management Corp.,* 46 N.Y.2d at 577, 415 N.Y.S.2d 800, 389 N.E.2d 113. Finally, the party challenging the provision—here, Aeromexico—has the burden to prove that it was not freely contracted to and is in fact an unenforceable penalty clause. *See P.J. Carlin Construction Co. v. City of New York,* 59 A.D.2d 847, 399 N.Y.S.2d 13, 14 (1st Dep't 1977); *Rattigan v. Commodore Intern. Ltd.,* 739 F.Supp. 167 (S.D.N.Y.1990).

Under these principles, the Court disagrees with Aeromexico and reaffirms its holding of February 15, 1995 that § 15(h) of the Lease is not an unenforceable penalty clause. As Wilmington correctly argues, the Lease cannot be divorced from the overall structure of the underlying transaction when analyzing the liquidated damages clause. The Series A and Series B Holders originally loaned over $17 million to Wilmington to purchase the aircraft leased to Aeromexico. Wilmington, as trustee for the Series A and Series B Holders, now seeks to recover the outstanding loan principal for the Series A and B Holders through the judgment amount and the proceeds from the sale of the plane. The approximately $9 million money judgment sought by Wilmington is essentially the Series A Holder's outstanding loan balance, while the proceeds from the sale of the plane are to be used to repay the Series B Holder's outstanding loan balance. Thus, the transaction is not simply a lease arrangement, but rather a loan made by the Series A and B Holders to allow Wilmington to purchase a

total funds actually received from Aeromexico after payment of the judgment amount will be $10,785,511.63.

**3.** Neither party addressed the issue of whether actual damages were difficult to estimate at the time of contracting. I interpret this silence as a concession by Aeromexico on this issue. Two

additional factors support this conclusion. The first is the decision to include a liquidated damages clause in a complex and highly sophisticated loan and lease agreement. Second, the value of the aircraft is not constant because it depreciates over time.

plane and lease it to Aeromexico on their behalf.[4]

Viewed from this perspective, the amounts sought by Wilmington pursuant to § 15(h) of the Lease are reasonably proportionate to the actual damages suffered by Wilmington and the Certificate Holders. As discussed above, the proposed order submitted by Wilmington provides that Aeromexico is to pay a judgment of approximately $9.2 million and return the aircraft. The judgment amount and proceeds from the sale of the plane are first to be used to pay the Series A Holder approximately $8.9 million,[5] which is the current amount owed to it by Aeromexico, and then to pay the Series B Holder approximately 5.7 million,[6] which is the principal owed to it as of the date of default, with interest. These payments, in addition to the $1.7 million previously withdrawn from the Cash Collateral Account, will provide the Series A and B Holders with a total payment of approximately $16.4 million. *See* Wilmington Let. at 3–4.

Had Aeromexico not defaulted, Wilmington would have received $12.5 million in rent over the remaining six years of the Lease term. Under § 19 of the Lease, Wilmington would also have received at the expiration of the Lease term the aircraft or—if Aeromexico had decided to keep the aircraft for itself or sell it to a third party—an additional payment of between $3.8 and $8.7 million.[7] Thus, Wilmington would have received between $16.3 and $21 million over the remaining term of the Lease. Assuming that actual damages would be measured by the present value of the amount Wilmington would have received under the Lease,[8] a recovery of $16.4 million at the present time cannot be said to be "grossly disproportionate" to a potential loss of $21 million dollars. Even if Wilmington's recovery under § 15(h) of the Lease turned out to be *more* than the present value of the remaining amounts it would have received under the Lease, that clause provides for no more than the acceleration of the outstanding principal amounts owed to the Series A and Series B Holders.[9] *See*

4. Additional evidence that the transaction is not simply a lease arrangement is that all of the operative documents—including the Lease, Trust Agreement and Indenture ("Trust Agreement"), and Participation Agreement—cross-reference each other and were signed on the same day by the same parties. Tr. at 22.

5. This amount is calculated by taking the "Stipulated Loss Value" of $10.1 million (the current amount owed to the Series A Holder, calculated under Exhibit A of the Amended Lease Agreement), subtracting the $1,789,699.75 received from the Cash Collateral Agreement and Aeromexico's partial payment of $17,689.10, and adding interest through February 17, 1995. *See* Affidavit of Thomas P. Laskaris ("Laskaris Aff."), Vice President of Wilmington, dated December 30, 1994, Exhibit 2 at Exh. A; Wilmington Let. at 3.

6. This amount was calculated by adding the principal owed to the Series B Holder as of the date of Aeromexico's default (approximately $4.7 million, calculated under Exhibit B of the Amended Lease Agreement), interest on this amount ($329,731.40 as of February 17, 1995), and a "Break Funding Amount" (calculated under Schedule III of the Trust Agreement). *See* Laskaris Aff., Exhibit 2 at Exh. B and Exhibit 5 at Schedule III; Wilmington Let. at 3. The Series B Holder's entitlement to the Break Funding Amount is disputed by Aeromexico and is addressed in Part II B(ii) of this Opinion.

7. If Aeromexico does not return the plane at the end of the Lease, § 19 of the Lease requires Aeromexico either to i) sell it to a third party and give a portion of the sale proceeds to Wilmington or ii) make a payment to Wilmington to cover the purchase of the aircraft by Aeromexico. *See* Laskaris Aff., Exhibit 1 at 64. If Aeromexico purchased the aircraft, Wilmington would have received approximately $8.7 million. *Id.* If Aeromexico had sold the aircraft, Aeromexico would have been required to give Wilmington $8.7 million from the sale proceeds, or, if the plane was sold for less than that amount, up to $3.8 million to make up any shortfall. *Id.* Thus, Wilmington would have received between $3.8 and $8.7 million in addition to the remaining rent payments. Of course, the low-end amount of $3.8 million would only be relevant if the aircraft had zero value at the end of the Lease term.

8. Both parties have assumed that, in the absence of § 15(h), actual damages would be the amount Wilmington would have received under the Lease in the absence of a breach by Aeromexico. *See* Wilmington Let. at 2–5; Def.Mem. at 21–24.

9. The Court also notes that the "Stipulated Loss Value"—the amount agreed to by the parties for the payment, at any point in time, of the principal then owed to the Series A Holder—considered the concept of present value by eliminating the interest that would have been paid to the Series A Holder over the full term of the Lease. *See* Tr. at 24.

*Rattigan v. Commodore Intern. Ltd.*, 739 F.Supp. 167 (S.D.N.Y.1990), *citing Fifty States Management Corp.*, 46 N.Y.2d at 577, 415 N.Y.S.2d 800, 389 N.E.2d 113 (upholding an acceleration clause in an employment contract even though the accelerated amount was much greater than the present value of what the employee would have received under the contract in part because "acceleration clauses ... common in loan and lease agreements, occasionally are denied enforcement as penalties, but 'in the vast majority of instances ... these clauses have been enforced at law in accordance with their terms.'"). In addition, the proposed order also provides that any excess amount from the judgment and proceeds from the sale of the aircraft are to be returned to Aeromexico; assuming that the sale occurs at some point before the end of the Lease term in 2001, Aeromexico will receive a higher residual value of the aircraft after the sale than it would have received at the end of the Lease.

Perhaps most significantly, Aeromexico's counsel conceded at oral argument that the Lease was a transaction entered into by sophisticated parties who were represented by able counsel. Tr. at 13–14. No evidence was presented by way of affidavit or otherwise that the terms of the Lease were not freely contracted to by able parties, and "absent some element of fraud, exploitive overreaching, or unconscionable conduct" on the part of Wilmington, the Court must enforce the agreement of the parties. *Fifty States Management Corp.*, 46 N.Y.2d at 577, 415 N.Y.S.2d 800, 389 N.E.2d 113.[10]

### B. Final Judgment Issues

The parties have indicated that three issues remain with respect to a final judgment consistent with the Court's oral decision of February 15, 1995: i) the applicable post-judgment interest rate to be applied to the amounts owed to the Series A and Series B Holders; ii) the Series B Holder's entitlement to the "Break Funding Amount" provided for in the Lease and Trust Agreement; and iii) whether the proposed judgment is final under Fed.R.Civ.P. 54 given that the order does not adjudicate Wilmington's claims for attorneys' fees and the expenses incurred in collecting the judgment amount and selling the aircraft.

#### i. Post–Judgment Interest

■ The parties do not agree on the post-judgment interest rate to be applied to the proposed judgment amount of over $9 million. Specifically, the parties differ on whether the amounts to be paid to the Series A and Series B Holders are "money judgments" governed by 28 U.S.C. § 1961(a) (1994) or whether these amounts should instead be governed by the interest rate set forth in the Lease and Trust Agreement.[11]

> Section 1961(a) provides in pertinent part:
>
> Interest shall be allowed on any money judgment in a civil case recovered in a district court ... Such interest shall be calculated from the date of the entry of the judgment at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury Bills settled immediately prior to the date of the judgment.

28 U.S.C. § 1961(a) (1994). The language of this statute is mandatory: once a claim is reduced to judgment, the original claim is extinguished, and a new claim, called a judgment debt, arises. Section 1961(a) governs the interest rate on this judgment debt. *Carte Blanche (Singapore) v. Carte Blanche (Int.)*, 888 F.2d 260 (2d Cir.1989), *citing Kot-*

---

**10.** Aeromexico's counsel did argue for the first time at the February 15, 1995 hearing that the Lease was in fact a contract of adhesion. Tr. at 13. Although counsel for Aeromexico did not negotiate the Lease on behalf of Aeromexico, he relied on his general experience with airplane leasing to claim that the lessee essentially takes all of the terms demanded by the lessor in the airplane leasing business. *Id.* This assertion, without more, is insufficient to raise a material issue of fact regarding the circumstances surrounding the negotiation of the Lease.

**11.** Under the terms of the Trust Agreement, the Series A Holder is to receive the "Past Due Rate," which is the London Interbank Rate ("LIBOR") plus 4.5%. *See* Laskaris Aff., Exhibit 4 at 15. The Series B Holder receives a Past Due Rate of 12.77%. *Id.*, Exhibit 4 at 7 and Exhibit 5 at 2.

*sopoulos v. Asturia Shipping Co., S.A.,* 467 F.2d 91 (2d Cir.1972).

By its terms, of course, § 1961(a) only applies to a "money judgment." Wilmington claims that, while a "money judgment" will be entered in Wilmington's favor, no money judgment is to be entered in favor of either the Series A or Series B Holders, who only receive payment after Wilmington distributes the cash received from the damage award and sale of the aircraft.[12] While Wilmington admits that it is acting for the benefit of the Certificate Holders, it claims that it is not acting as their agent and its duty, pursuant to § 3.2 of the Trust Agreement, is therefore to pay the Certificate Holders the contractual rate of interest when calculating post-judgment interest.

The Court rejects this claim as to the Series A Holder. While the money judgment in Wilmington's proposed order nominally runs between Wilmington and Aeromexico, the Series A Holder, through Wilmington as the trustee for the trust of which the Series A and Series B Holders are the beneficiaries, is in effect reducing its claims against Aeromexico to judgment. Indeed, the Trust Agreement provides that, in an event of default, Wilmington must act according to the instructions of the Series A Holder, which include exercising all of the remedies under § 15(h) of the Lease. *See* Laskaris Aff., Ex. 1 at § 15(h). The money judgment calculated under § 15(h) embraces the "Stipulated Loss Value" to be paid to the Series A Holder—which is in effect the Series A Holder's outstanding loan balance—and the money judgment is thus for all intents and purposes the amount that will be paid to the Series A Holder to satisfy its debt on the aircraft.

However, the Court finds that § 1961 does not apply to the amount to be paid to the Series B Holder. The Series B Holder holds its Loan Certificates "without recourse," meaning that it can only look to the proceeds from the sale of the plane to satisfy its debt and that Aeromexico cannot be compelled to pay any shortfall. *See* Wilmington Let. at 7. Thus, because the Series B Holder's only potential recovery is through the sale of the aircraft, a "money judgment" is not entered in favor of the Series B Holder.[13] In addition, the Court agrees with Wilmington that it would be unfair to deprive the Series B Holder of the contractual rate of interest on its debt given that it is required to wait until the aircraft is sold before collecting any money. *See* Wilmington Let. at 7. Thus, the Series B Holder is entitled under the Trust Agreement to a post-judgment interest rate of 12.77%. *See* Laskaris Aff. at Exhibit 4.

### ii. *The Break Funding Amount*

The parties do not agree on whether the Series B Holder is entitled to a "Break Funding Amount" payment of $657,977.00.[14] The Break Funding Amount is determined by calculating the present value of the unpaid principal and interest scheduled to be paid under the Series B Lease Participation Certificates at the time of a default by Aeromexico. This amount is first discounted using the "Market Rate" (defined in Schedule III of the Amended Trust Agreement as the "Treasury Note Proxy Rate" or the rate equal to the yield on a hypothetical U.S. treasury instrument with a maturity equal to the average life of the remaining Series B Lease Participation Certificates at the time of determination) and next using the "debt rate" of interest (defined in Section 1.1 of the

**12.** The proposed order and judgment submitted by Wilmington requires Wilmington to sell the aircraft and distribute the cash proceeds from the damage award and the sale of the aircraft to satisfy first the Series A Holder's debt and then the Series B Certificate Holder's debt.

**13.** This does not mean that the Series B Holder can only be paid from the proceeds derived from the sale of the aircraft. For example, if the aircraft were sold prior to the payment of the judgment amount and the Series A Holder was fully paid from the sale proceeds, the Series B

Holder would still be entitled to receive the remaining proceeds as well as part of the money judgment in order to fully repay its outstanding loan principal.

**14.** The purpose of the Break Funding payment is to compensate the Series B Holder for the fact that if the amounts it is due to receive under the Lease are paid early as a result of a default or for another reason, it may not be able to reinvest those funds in investments that will pay the same interest rate it would have received under the Lease. Wilmington Let. at 9–10.

Amended Trust Agreement as approximately 10.77%). *See* Laskaris Aff., Exhibit 5 at Schedule III and § 1.1. The difference between these two discounted amounts is the Break Funding Amount. Thus, the Break Funding Amount formula results in a payment equal to the difference, on a present value basis, between the interest that the Series B Holder would have been paid under the Lease had Aeromexico not defaulted and the interest that the Series B Holder would have received had it invested the outstanding balance of its loan in United States treasury securities with the same remaining term. *See* Wilmington Let. at 10.

In addition, "Market Rate" in Schedule III is defined as the Treasury Note Proxy Rate plus the "spread" amount in effect at the time the prepayment (i.e. Aeromexico's default) occurred. *See* Laskaris Aff., Exhibit 5 at Schedule III (" 'Market Rate' means the Treasury Note Proxy Rate plus the spread in effect on the date of such prepayment."). The chart immediately below this definition lists the "spread" amounts in the following manner:

| Date of Prepayment (in months from funding date) | Spread (in basis points) |
|---|---|
| 37 through 48: | 175 |
| 49 through 60: | 250 |
| 61 through 72: | 300 |
| 73 through 85: | 375 |

*Id.*

To Aeromexico, the definition of Market Rate and the chart contained in Schedule III of the Amended Trust Agreement indicate that the parties did not contemplate that a Break Funding Amount would be paid based on a prepayment effected before the 37th month after the Funding Date. *See* Aeromexico Letter, dated March 6, 1995 ("Aeromexico Let.") at 7. Because a prepayment of the Lease Participation Certificates was required within 24 months of the Funding Date due to Aeromexico's default, Aeromexico

claims that it is not required to pay a Break Funding amount.[15] By contrast, Wilmington claims that the language in Schedule III of the Trust Agreement simply means that, if the prepayment of the Lease Participation Certificates is within 37 months of the Funding Date, no "spread" is required to be added to the Treasury Note Proxy Rate in the calculation of the Break Funding Amount. *See* Wilmington Let. at 8–9.

The Court agrees with Aeromexico and finds that the language of Schedule III is clear: the Series B Holder is only entitled to a Break Funding payment if Aeromexico's prepayment occurred at least 37 months after the Funding Date. As noted above, the definition of "Market Rate" in Schedule III contains two components: i) the "Treasury Note Proxy Rate" plus ii) the "spread" in effect on the date that Aeromexico defaulted. Since the spread amount is only defined for prepayments beginning 37 months from the Funding Date, "Market Rate" is only defined for prepayments beginning after this 37 month period. Consequently, the Break Funding Amount, which is defined by reference to the "Market Rate," is also not defined for this initial 37 month period and a Break Funding payment cannot be calculated or paid during this time. Further support for this conclusion stems from the fact that the chart reproduced above does not indicate even a "0" spread amount for the period beginning with the commencement of the Lease and ending with month 37. Finally, it is of no import that the Trust Agreement states that the Break Funding Amount is payable upon acceleration of the Lease Participation Certificates without referring to this 37 month limitation; references to the Break Funding Amount in the Trust Agreement should be considered in light of the definition of that amount set out in Schedule III.[16]

---

15. Aeromexico's default occurred in November, 1994 which is within 24 months of the Funding Date of December 23, 1992. *See* Wilmington Let. at 8.

16. Even if the Court were to find that Schedule III and the Trust Agreement were ambiguous, Aeromexico has submitted uncontradicted parol evidence indicating that the parties intended that

Aeromexico pay a Break Funding Amount only if the prepayment of the Lease Certificates occurred after the third anniversary of the commencement of the Lease. *See* Affidavit of Kenneth R. Lee, Counsel to Aeromexico, who was involved with the negotiation and drafting of the Lease, dated March 6, 1995 at ¶ 8.

### iii. *A Final Judgment*

The parties disagree on whether Wilmington's proposed order and judgment is a final judgment. Aeromexico contends that the proposed order and judgment is not a "final judgment" within the meaning of Fed.R.Civ.P. 54(b) because it does not adjudicate Wilmington's claims for i) reasonable attorneys' fees and ii) the expenses incurred in collecting the judgment amount and selling the aircraft. Aeromexico Let. at 8.

Once some—but fewer than all—claims in a lawsuit have been fully adjudicated, Fed.R.Civ.P. 54(b) commits the decision to certify a final judgment to the discretion of the Court. *See Curtiss–Wright Corp. v. General Electric Co.*, 446 U.S. 1, 8, 100 S.Ct. 1460, 1465, 64 L.Ed.2d 1 (1980). A final judgment may be entered as to less than all of the claims in a case "only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." Fed.R.Civ.P. 54(b). In addition, a certification under Rule 54(b) should be granted only if there are "interest[s] of sound judicial administration" and efficiency to be served, or "in the infrequent harsh case," where "there exists some 'danger of hardship or injustice through delay which would be alleviated by immediate appeal.'" *Harriscom Svenska AB v. Harris Corp.*, 947 F.2d 627, 629 (2d Cir.1991) (citations omitted).

The Court finds that there is no just reason for delay in the entry of a final judgment. The proposed order and judgment fully adjudicates Aeromexico's liability under the Lease and contains all of the relief sought in Wilmington's complaint—namely, a damage award of over $9 million as well as the return of the aircraft. While the proposed judgment does grant the Court continuing jurisdiction to resolve any future disputes over attorneys' fees and expenses incurred in selling the aircraft and collecting the judgment, a future award of attorneys' fees and expenses would only give Wilmington further relief without reducing the relief already granted. It is thus more efficient to enter a final judgment on Wilmington's claims for damages and the return of the aircraft now, given that the largely ministerial task of determining the amount and reasonableness of attorneys' fees and expenses will not reduce the judgment amount and in any event can only be fully determined after the aircraft is sold and the judgment amount is collected. Finally, appellate resolution of Aeromexico's liability may also serve to facilitate an efficient resolution of these remaining issues.[17]

### III. Conclusion and Order

For the foregoing reasons, plaintiff's summary judgment motion is granted. It is hereby

**ORDERED**, that judgment be entered herein in favor of the plaintiff for damages in the amount of $9,227,809.08, reflecting an award of $8,978,112.70, with interest on $685,511.63 calculated from October 23, 1994, to February 17, 1995, in accordance with the terms of the Lease Agreement (1992 MD 82–2) entered into by plaintiff Wilmington Trust Company and defendant Aerovias de Mexico, S.A. de C.V. on December 1, 1992 and amended on July 29, 1993 ("Lease Agreement"), and interest on $8,292,611.15 calculated from December 1, 1994, to February 17, 1995, in accordance with the terms of the Lease Agreement, and that interest on the judgment for $9,227,809.08 shall accrue thereafter in accordance with 28 U.S.C. § 1961 to the date of payment; and it is further

**ORDERED**, that defendant Aerovias de Mexico, S.a. de C.V. is **ENJOINED AND DIRECTED** to return the McDonnell–Douglas MD–82 airplane bearing manufacturer's serial number 49149 (the "Airframe") and two Pratt & Whitney Model JT8D–217 series engines bearing, respectively, manufacturer's serial nos. P709705D and P709706D (the "Engines") (collectively, the "Aircraft"), which are the subject matter of the Lease Agreement, to plaintiff within twenty (20)

---

17. Fed.R.Civ.P. 58 explicitly provides that the "entry of a final judgment shall not be delayed, nor the time for appeal extended in order to tax costs or award fees." Thus, Fed.R.Civ.P. 58 provides an additional ground on which to enter a final judgment even if Wilmington's claim for attorneys' fees is pending.

days hereof. Such return shall be made pursuant to and in full accord with the terms of the Lease Agreement.

ORDERED, that plaintiff Wilmington Trust Company shall, within a reasonable time after receipt, sell the Airframe and the Engines, in a commercially reasonable manner in accordance with Uniform Commercial Code § 9–504, utilizing an independent remarketing agent unless otherwise agreed by the parties, and that the proceeds of such sale shall be distributed by Wilmington Trust Company as set forth below; and it is further

ORDERED, that the cash received from payment of the damage award and the sale of the Aircraft shall be distributed by Wilmington Trust Company in the order received by it as follows:

(a) Wilmington Trust Company shall retain amounts reasonably required as reimbursement for any tax, expense or other loss incurred by it including, without limitation, the expenses of the sale of the Aircraft, reasonable attorneys' fees and expenses, court costs, and any other reasonable expenditures incurred or reasonable advances made by Wilmington Trust Company in the protection, exercise or enforcement of any right, power or remedy in connection with the Lease Event of Default;

(b) Wilmington Trust Company shall pay to Greyrock Capital Group Inc., the Series A Certificate Holder under the Trust Agreement and Indenture (1992 MD 82–2) entered into by plaintiff Wilmington Trust Company and defendant Aerovias de Mexico, S.A. de C.V. on December 1, 1992 and amended on July 29, 1993 ("Trust Agreement"), amounts reasonably required as reimbursement for any tax, expense or other loss incurred by it including, without limitation, the expenses of the sale of the Aircraft, reasonable attorneys' fees and expenses, court costs, and any other expenditures incurred or advances made by Greyrock Capital Group Inc. in the protection, exercise or enforcement of any right, power or remedy in

connection with the Lease Event of Default;

(c) Wilmington Trust Company shall pay to Greyrock Capital Group Inc., $8,906,664.05,. which represents the principal owed on the Series A Certificate Holder's loan as of July 23, 1994 less amounts applied from the Cash Collateral Account on November 17, 1994 (with interest to February 17, 1995, determined in accordance with the Trust Agreement), plus any interest accrued on the $8,906,664.05 from February 17, 1995 to the date of payment, to be calculated in accordance with 28 U.S.C. § 1961;

(d) after the Series A Certificate Holder has been paid in full, Wilmington Trust Company shall pay to USL Capital Corporation, the Series B Certificate Holder under the Trust Agreement, amounts reasonably required as reimbursement for any tax, expense or other loss incurred by it including, without limitation, the expenses of the sale of the Aircraft, reasonable attorneys' fees and expenses, court costs, and any other reasonable expenditures incurred or reasonable advances made by USL Leasing Corporation in the protection, exercise or enforcement of any right, power or remedy in connection with the Lease Event of Default;

(e) Wilmington Trust Company shall pay to USL Capital Corporation, $5,048,404.63 the principal owed on the Series B Certificate Holder's loan as of July 23, 1994 (with interest to February 17, 1995), plus any interest accrued on the $5,048,404.63 from February 17, 1995 to the date of payment, to be calculated at 12.77%;

(f) There being no just cause for delay, the Clerk is directed to enter Judgment as set forth herein. Without affecting the finality of this Order and Judgment, any dispute concerning the expenses of the sale of the Aircraft, attorneys' fees and expenses, court costs, or any other expenditures or advances for which Wilmington Trust Company, the Series A Certificate Holder or the Series B

Certificate Holder are paid or to be paid, pursuant to paragraphs (a), (b) or (d) above, shall be settled by the Court; and it is further

**ORDERED,** that any additional money held by Wilmington Trust Company after reduction by the amounts specified above shall be distributed by Wilmington Trust Company to defendant Aerovias de Mexico, S.A. de C.V.; and it is further

**ORDERED,** that for good cause having been shown, the judgment issued herein may be registered in any United States District Court at any time on or after the date upon which execution may issue in this District.